This case on the docket, 2-14-0402. Camilo Macias, Attorney for the Accountant, v. Naperville Gymnastics Club, Defendant Accountant. Arguing for the Accountant, Attorney Masha P. Chekhov, arguing for the Accountant, Attorney Anne P. Pelbo. Good morning. I hope it wasn't too difficult for you folks to get here. Ms. Chekhov, you can proceed. Good morning, Your Honors. Will you please the court? Thank you first for the opportunity to present this matter before you today. My name is Masha Chekhov and I represent the appellants in this matter, Mr. Camilo Macias. The appeal arises out of the granting of summary judgment to the appellee based on the exculpatory clause signed by my client. We believe that the trial court erred on two main bases. The first is the fact that the exculpatory clause was not, as a matter of law, valid and enforceable. And the second is that the trial court erred because it was barred by the prior ruling of Judge Hollis Webster on the motion to dismiss. The case law... When Judge Webster denied a motion to dismiss, that was 2619 motion, correct? Correct. It was a motion to dismiss. So then the grant by the other judge was a summary judgment? Correct. So there was discovery, I would assume? There was discovery, but our argument is that the sufficiency of the evidence, more importantly in this case, it's very clearly, it's the language of the release. It was the same when my client signed it. It was the same on the day that we did the motion to dismiss and it was the same on the day of the motion for summary judgment. And both Judge Hollis Webster and Judge Ellison are both ruled on the language of the contract. The sufficiency of that evidence does not change with time. The whole purpose of the law of the case is so that there are not inconsistent decisions throughout the case with the change of judge. And yet that's exactly what happened here. Judge Hollis Webster very clearly said that based on her reading of this release, she found the language to be ambiguous. She did not find it to be enforceable based on the various clauses. And yet, on the motion for summary judgment, reiterating their exact argument with regards to Section 1, that being the enforceability of the clause, Judge Ellison came to a completely different decision based on the exact same language. He went on to state that he believed that the more detailed and specific the language, the more it led him to enforce that language. But the language was the same. Well, and the law of the case technically doesn't apply. Law of the case is when something is appealed. So, but you're saying that the trial court can't ever revisit a situation before final judgment? I think that what the law of the case says is, in this case, what Judge Hollis Webster stated was that she believed discovery was warranted. And if additional facts were brought out through discovery that the defendant then could use to add to their argument for a motion for summary judgment, that that issue could then be revisited. Didn't the defendant cite numerous passages from the plaintiff's deposition? To show that this, at least to the plaintiff, this wasn't ambiguous, it wasn't a problem at all. He understood every clause in the thing. Well, I think if we look at both what was cited in the defendant's brief, as well as what was cited by Judge Ellisoner, it only looked at the direct examination. And if we look at the questions that were posed to the plaintiff in the direct examination... Well, I don't care what's cited by Judge Ellisoner, because we're on de novo review now. Correct. I understand. And first of all, I just want to clear something up. The transcript says Judge Ferguson. Is it Judge Ellisoner? Were you there? It was Judge Ellisoner. Yeah. Yes, the presiding judge is Ferguson, and that's why I think it shows that. But it was Judge Ellisoner. Presiding judge Ferguson. I was wondering the same question when I saw that. And we were wondering the same thing when we went to the transcript, because that's the way it was printed out. But it was Judge Ellisoner. Well, I'm guessing maybe Judge Ellisoner, it was in Judge Ferguson's court, and Judge Ellisoner was the chief judge and came in to hear this case? Correct. It was right after Judge Hollis Webster left, and I think things were... Nameplates and stuff weren't quite there. I just want to make sure we get that right in the case. But to address your question, Your Honor, it's my opinion that when we're looking at the questions that were posed to Plaintiff, the questions were, do you understand the term inherent risks? Do you understand now what a foam pit is? And when he was asked questions on cross-examination, it was, did you understand what the inherent risks were of the sport of gymnastics at the time that you signed the release? This is a subjective standard. We're not asking the term inherent risks. And that's one of the main problems of this release, is it says, I understand or I have knowledge of the inherent risks. It does not say anything more than that. And the plaintiff's knowledge is not after the fact. It's at the time that he signed this release. Can a release put you on notice of inherent risks? I mean, if I sign a release that says a risk of jumping out of an airplane with a parachute is the parachute may not open and you may go splat on the ground. Do I then now know that that's an inherent risk? And tying it to this case, it talked about landing on landing surfaces, which your client agreed was the foam pit was a landing surface, could cause broken bones up to death. And those things are in the release. So can the release put someone on notice of the inherent risks? I believe if the release is specific enough and someone has, once again, the subjective knowledge coming into the signing of the release, then it can. Like, for example, we understand that when one jumps out of an airplane, they're going to use a parachute and they're going to jump out of that airplane. My client walking in had no idea that a foam pit was even inside of that gym. He had no idea that that would be considered a landing surface. He, more importantly, had no idea what a foam pit was before he entered that gym. And he had no way of looking inside of the gym because the way the gym is designed, where you pay and where you sign the release is outside of the gym. And you have no way of even looking in. Well, he didn't have to sign that release, did he? I mean, once he walked in, I mean, he could have decided actually not to participate. If he had no idea of the risks, he had signed off this waiver and he took a look and he didn't know. I mean, he could have said, I'm not going to do this. And I think that's similar to the court's decision in the Hammer versus Chicago Segway case. And in that case, I think what's very pertinent is the court's decision stated very specifically that after seeing a video, after giving the hands-on training to the plaintiff in that case, they had an opportunity based on an informed decision to choose not to participate, even after signing the release. In this case, my client never had that opportunity. What he did is he signed the release before going in. He walked in and he saw what to him, as a novice participant, was the safest place to go. Not on the bars, not on a trampoline where one lands on a surface, not on a balance beam that someone could fall off of, but jumping into a pit full of foam. To him, he was doing what to him seemed to be the most safe activity there. And with that said, the gym knows that, in fact, as opposed to being one of the safest places, it's actually one of the most dangerous places. And if we look at a lot of the open gyms that are open both for small children, whether it be at a jump zone type facility or a gymnastics gym, they always have someone stationed at that foam pit. And the reason is, is because it is dangerous. And people that are not familiar with the sport of gymnastics don't realize how badly you can get injured even though it's a foam pit. And the defendant knew that. And even with that knowledge, they failed to have anybody there standing at that pit. So you're saying if someone had been standing at the pit, then they would have just gone up to whichever person was next in line and said, do you know this is a foam pit? This is a landing surface. You can. This is as dangerous as any other piece of equipment? No, Your Honor. As opposed to what is actually written in this exculpatory clause? No. What would the purpose of the person at the pit be? Well, in the case of Mr. Macias very specifically, with all due respect, my client was over 6'2 and over 300 pounds. How old was he? 20? 20 years old? 19, yes. He was not that foam pit. The reason he broke his neck was because he sunk to the bottom. He hit his head on the bottom. He went right through that foam pit. And when he jumped in the air, between his size and his weight and his height, it propelled him in the air to where he lost control of his body. He went head first. And his head struck the bottom. Shouldn't he have waited until there was a supervisor there? I mean, the release says I'm not going to use any areas unsupervised. And he did not. And that was possibly the fault, obviously, clearly, due to his injury of his own. But it was also the defendant's responsibility to have somebody there and to have the gym posted. And he was also supposed to be told the rules and the procedures for the various parts of the gym, including the equipment, that being either a springboard or a vault table or a foam pit or a trampoline. And that wasn't done here. And to give the defendant the benefit of the exculpatory clause when there is an exchange of money and they fail to take the necessary protocols to meet even the bare minimum of both supervising the facility and providing training to the plaintiff or anyone else that was in that gym. And, yes, I, of course, understand and respect the argument that, well, if he didn't think it was safe, he should have stopped. He could have done this. But by the same token, we're setting a precedent when we're saying, you know what, here, you can sign a blanket release. You know, I'm sorry if I have, you know, I'm going to go take a phone call or I'm going to go, you know, we're short staffed today, so we're going to keep the open gym open. You're putting people at a risk. And a lot of these children were minors, as is evidenced by the deposition transcripts. Well, this was, I mean, the argument from the other side is this wasn't a blanket release. And if we're talking about Calarco, we're talking about Masek, those were seen as basically blanket releases because they didn't have the, what you were actually releasing, what activities were involved, and they clearly didn't say that you were releasing the defendant from any negligence on their part. This is much different. And the cases where the things are listed and where the negligence, you know, is listed, generally come down against your position. And, in part, that is correct, Your Honor. But the other part of the argument in both Calarco and Masek that the court looked at wasn't just the exculpatory clause itself, that one section, but they talked about a contract being read as a whole. And the fact that when, in both Calarco and Masek, there was one where it said a physical ability to participate, and in Masek it said I hereby certify that I am physically fit. And the court said that when reading those two phrases together, it wasn't the exculpatory clause as much lacking the specificity of what it was that there was a release for, but in those cases the judges said that it was also reading the contract as a whole, that it became ambiguous as to when they were going to be released. Well, they said that added to the ambiguity of not listing the activities and not listing the negligence, the fact that you had this other thing in there. But if you have the activities listed, which is the argument in this case, and you have the negligence listed, which is, again, the argument in this case, then that argument loses a great deal of weight reading the contract as a whole, does it not? Correct. But by the same token, to create a very overly broad, four-section, two-page contract in what is at best six-point font, to have somebody read every single section of that, and more importantly, when one reads the contract, they read Part 1, 2, 3, and 4. And in this case, Part 4 is the release and the exculpatory clause. Part 1 says at the very top, in all caps, the only part of the contract that's in all caps, says that I will be given rules, that the facility will be supervised. And that provides one with a reasonable expectation that there will be a safe place for them to go and participate. It more importantly tells them that they will be given some type of training. Well, a safe place doesn't mean no accidents can happen. Correct. It does not. But it does mean that there has to be proper supervision. And looking at the facts in the light most favorable to the plaintiff, there was one person in a very, very large gym checking stamps at the door, and nobody inside an entire facility where there were 30 to 40 participants. Now, you're not saying that the failure to read the document, did you? You did state at some point that he didn't, and I think in interposition, he didn't read the entire document. Is that correct? Correct. Okay, certainly that can't be the proximate cause. Correct. And I am in no way saying that he did not read the argument and therefore they should have been there to make him read the argument. I mean, that is someone's free choice whether or not they read an argument. But whether or not one reads the release, we still have to look at the release. And if he would have read the release, what would a reasonable interpretation, a subjective interpretation of that be? And would that, number one, would the release look ambiguous? And number two, is the injury that occurred foreseeable to a novice participant? Well, he testified in his deposition that had he read it, he would have known that he could be injured from landing on this landing surface. Again, we need to look at how the questions were worded. The question was worded, as you sit here today reading the release, do you understand that the foam pit was a landing surface? The answer is yes. However, when asked on cross-examination at the time when you walked into the gym, were you aware of whether there was a foam pit in there? The answer is no. He didn't read it at that time. So how could you compare the two? Well, it doesn't say foam pit. No, it says landing surface. Well, correct, but that would be like saying, do you know that a trampoline is a landing surface, but are you aware that there's a trampoline in there? He had no idea that a foam pit was contained in there. And when you're talking about a novice participant's understanding of gymnastics, a foam pit is not something that one would envision. They envision mats, balance beams, and bulbs and bars, but they don't envision a foam pit. Well, we're talking about summary judgment, and we're talking about a subjective test, as you're indicating. And look at C-174, page 109 of the transcript. And it says landing on the landing surfaces. That landing surfaces would have included the foam pit. Answer, yes. And that's what you would have understood it to be on January 15th of 2011. Answer, yes. How do we get away from that? I mean, your argument is that's not what he would have understood it to be, but he testified that that's what he understood it to be on the date that he was injured. And if I could point, Your Honor, to our brief where we discuss what Mr. Macias stated on cross-examination, and I apologize. Give me just one moment to locate it in the brief. It would be to C-192, where it says, prior to that exchange, Plaintiff described his exposure to and understanding of gymnastics activities at the time he executed the release. Question, have you ever seen a foam pit before? No. What about a springboard? No. What about a ball table? No. Prior to walking into the gymnastics gym at Naperville Gymnastics, had you ever been inside a gymnastics gym? No. And he goes on to state that his understanding is based on what he sees on TV. And then the question goes specifically with regards to the foam pit. Were you aware that there was a foam pit of what a foam pit is prior to walking into the gym? Not really. So is it safe to say that you weren't aware that there was a foam pit at this gym, correct? Right. And you're not being acquainted with a foam pit. You didn't know how deep the foam pit was, is that correct? Yes. And you also weren't aware of how to properly jump into it. But he states very clearly that at the time that he signed the release, what his knowledge was, as opposed to reading it now, after what happened, do you understand what that means? And I don't think that that's the same thing because the standard isn't what does he know after, unfortunately, this horrific accident happened to him, but what he knew at the time that he signed it. Thank you. Thank you. You'll have an opportunity in recovery. Mr. Elbogen. Good morning, counsel. Andrew Elbogen for the Appalachia-Naperville Gymnastics Club. I will refer to them as the gym throughout the proceedings. Counsel indicated in her oral argument a few minutes ago that there were basically two elements, broadly speaking, with regard to her client's appeal. The first was with regard to the sufficiency of the exculpatory clause. And the second was essentially a res judicata type of argument with regard to the 2619 ruling by Judge Webster. Just to clarify, you know, I had all these prepared notes and pages and pages, but I think just kind of to get to the crux of this issue with regard to the 2619 motion, which was denied, of course, by Judge Webster. What happened between the 2619 and the motion for summary? Discovery was pursued. Now, I would like to let me just add a little further, if I may. The judge invited us. Judge Webster invited the parties to pursue discovery, and she made it clear. And I'm quoting her language, and I don't have the doc in front of me, but it's in our brief, and it's from her ruling. And she says, so I just think, based upon the standards, it's inappropriate for me to dismiss the claim at this point. But again, without prejudice to you pursuing this from a fact-based, there is case law on both sides of these exculpatory clauses. And I agree it's something that can be developed from a discovery standpoint, but I think it's something that is better suited from our summary judgment motion, if the facts do bear that out from the defense's perspective. So the court essentially was stating, I think it's a bit premature, counsel, defense counsel, at this point for you to pursue this. I'd like you to pursue some discovery. This is, by the way, I think a very standard, and these are the types of rulings defense counsel receive all the time when they come. And they bring 2615 and 2619 motions, especially 2619 motions, where there are other affirmative matters. And the courts are thinking they have got to give the plaintiff their day in court to some degree by allowing that discovery to pursue. And in this case, discovery did pursue. This panel has addressed the testimony of the plaintiff. We haven't talked much about the testimony of various employees of the defendant, but of course there were three such depositions taken. So discovery did, pardon me, discovery did pursue. So what in the discovery made this clause explicit enough to grant a summary judgment? Well, I think some of the questions that were posed to counsel earlier illuminate, suggest some of the answers. And that is the court wanted to test out, or rather, we tested the plaintiff's understanding of the various terms. I would argue- But again, were those understandings of the terms at the time he was sitting in that deposition, or were they his understanding of the terms at the time he walked into that gymnasium? Is there a difference? No, there's not. Because he was asked at the time, first of all, he was of majority age at the time. Not that that's- How old? He was 19 on the date of the accident. He would have probably been around 21 or 22 at the time of the deposition. I may be incorrect about his age at the time of the deposition. I know he's 19 on the date of the occurrence. Does 19 make a young man an adult or pretty sharp? I mean, do men ever really come out of that knucklehead stage? I'm not going to- No disrespect to any of you men here. I mean, you may be right, Your Honor. And I may have the conceivable- Well, don't take it. I may have- A 19-year-old young man. I may have to concede the point that I believe that the law would view him as being an adult. What changed, though, is that, first of all, the release terms, quite frankly, with no disrespect to Judge Webster, are repeated and they are clear, they are unequivocal, and they constantly- This is a fastidious release. So you're saying that because they say landing, that's explicit enough. It's consistent- It says more than that. It says more than that. And the plaintiff- And so before- If I just may real quickly. The plaintiff was asking various, various terms throughout his deposition as to would he have understood this at the time had he read it. And he said, yeah, if I had actually read this document, if I had seen these posted rules or paid attention to them that are on the door, that are on the phone pit, that are exploding scoreboard headline warnings, he said, yeah, I would have understood all of that. And I think that's why this Court ultimately granted the summary judgment motion. I was just going to ask, with respect to the language on inherent risks, though, doesn't this inherent risk language, which focuses on the extent of all the risks inherent in gymnastics, really create an ambiguity as to whether this exculpatory language covers only dangers inherent in gymnastics, as opposed to this phone pit, a separate landing site? Well, I think that's a fair question. And I think, as Judge Burke pointed out a little earlier in questioning of plaintiff's counsel, if you've got a blanket release and you've got language that you just referenced and that's really it, if that's all there is, then I would agree with you that that would be more akin to a blanket type of release. It would be vague and it would fall within the category of those cases where the releases were found to be too vague, void for public policy. But in this instance, if I may, we've got multiple warnings and multiple examples of specific risks that need to be addressed by the signatory to this agreement. Starting with the initial language talking about inherent risks, then there's a covenant not to sue. But within that, they're talking about any manner of injury resulting from falling off of the gymnastics equipment. And the plaintiff was asked, well, if you had read that on the date of the occurrence, would you have understood? He said, yeah, because I'm a reasonably intelligent person. He doesn't say that, but that's the only implication that can be construed from it. There were no cognitive deficits or anything else that could possibly be claimed or that he's a minor. Then this release goes on to talk about failures of equipment, not necessarily relevant to this case. Injuries occasioned from other users of the gym, again, not relevant to this case, but it just goes to show how specific and fastidious this release is. Fastidious is a nice way of saying it. It's almost anal-retentive in how specific it is. And I don't think any of the releases that passed muster by the appellate courts and prior decisions that were cited, both by the plaintiff and defendant and by the court at summary judgment motion, had releases quite as fastidious as this one. This one was continuing on. It then talks about injuries from landing on the landing surfaces, which the plaintiff understood. He also understood that the foam pit was a landing surface. He would have understood it on the date of the occurrence. I think Judge Burke read some of the salient language. So the problem here for the plaintiff is that the old adage of ignorance under the law will not protect you, and I mingled the cliche. But the point is, is that there is case law that specifically states you can't really rely upon alleged inadequacies of the release slash exculpatory clause if you hadn't read it. I don't think we need to get there, quite frankly, because this release is so darn specific. But just carrying on some additional arguments before my time runs out. With regard to the brief that the plaintiff cites, and we didn't really discuss this so much in the plaintiff's presentation, there were some arguments about warnings in general throughout the appellant's brief. There was signage on the door when he entered that we reviewed with him during his deposition. He understood all of the prohibitions because they're so clear. And then the showstopper is the actual foam pit warning that is posted on the wall. This warning, the warning on the door, had been in existence since day one when the facility opened in 1997. And the plaintiff incidentally never said that these warnings didn't exist. He never said the release wasn't there. He never said we signed it. He never said that the warnings on the door weren't there. He never said that the warnings on the wall with regard to loose foam pit rules weren't there. He acknowledges that he just didn't read it. I don't know how he missed it because it couldn't be more conspicuous. And the only reason I'm taking on this argument is because it takes up a great majority or a substantial portion, I should say, of the plaintiff's appellant brief, and so I wanted to address that with you. But what about counsel's argument that the club really had an obligation to have someone stationed at that pit? Yeah, I would respectfully disagree. I don't believe that there would be any duty that we've seen in any of the cases under circumstances where warnings have been provided, both in the release, the exculpatory clause, the doorway, talking about supervision, and the warnings that were all over the walls. And these, by the way, were not the only warnings that were on the wall. These just happened to be so prophetic because they talk about not belly flopping.  So I would argue that there is no case law or standard that would require us to have a supervisor at every station within the gymnastics facility, but I would argue that the loose foam pit rules that talk about no diving or belly flops. But did he mean to dive or belly flop? I mean, wasn't it as a result of the equipment that he happened to go head over teeth, heddle, if you will? No, I think he meant to – I think he did mean to belly flop. He didn't mean to break his neck, that's for sure. In Illinois, courts in Illinois aren't in favor of these exculpatory clauses, are they? I beg your pardon? Courts in Illinois are not in favor of exculpatory clauses. Aren't we to strictly construe those in favor of – You should. You should. And I think Judge Burke pointed out earlier that blanket exculpatory clauses slash releases are not favored. And many – a substantial number of these releases are clumsily worded, are not sufficient, and so they have to be strictly scrutinized because we want – because if the release slash exculpatory clause is well written, is fastidious, in specific, and in this case prophetic about what could have occurred, then the courts have consistently held that under those circumstances we will uphold the provisions of the exculpatory clause and execute its terms and its – Isn't this foam pit almost an attractive nuisance to people who don't know what the heck they're all about? I mean, you're talking about a – the counsel's arguing a subjective 19-year-old plaintiff, whether that person understood that in any way jumping into this foam pit could ordinarily result in an injury, where, I mean, if I look at this thing, I'm thinking, that's pretty harmless. I could probably jump in at any which way. It'll Tuesday. I'm not going to get hurt. Well, I – you know, so I was thinking something along the lines of considering that argument, and it would be as though if – I suppose very generically there may be some inherent appeal to that argument, but he didn't just jump into the foam pit or just fall into it. He got up on a vault table. Well, it was in front of it, right? Yeah, it was – The springboard was in front of the foam pit. But he actually got on a vault table. And I would say that even a 19-year-old boy, once he's elevated and above ground and sufficiently above ground, any kind of a belly dive into any type of subject, it will – if he doesn't know that, then I'm sorry. He jumped off a vault. You're talking about like a – Springboard. No, but he went onto a springboard, but jumped off of something. It's my understanding he jumped off of the vault table and fell a sufficient amount to have – which would certainly probably be contributing cause to his broken neck. And a vault table is like a pommel horse type of thing. So you're saying he jumped from the vault table to the springboard into the pit? I think the springboard was in front. There's actually a picture of it in the record. I thought he jumped from the springboard, which Cat had folded him. No, no. In fact, there's testimony from one of our clients that he gets up on this – he's up on this vault table, and our lady's screaming at him to get his rear end off of it, get off of that. So first you've got the springboard, then you've got – and it's in the record – and then you've got the table, and he jumps from the table to his calamitous injury. Anything for the – Thank you. That's Athena. Thank you, counsel. Ms. Chepon-Vigil. Before you get started, counsel, it brings up a very good point, some very good points, I mean, other than the Calarco YMCA case. You have a lot of case law that is working against you with respect to these clauses, Owen v. Vic Tanning. I mean, it's not anywhere near as specific, the Coubinson v. Chicago Health Club. Not anywhere near as specific and as anal-retentive, as your opponent states, as the exclusionary clause in this case. And to address that, I'd like to say that sometimes throwing too much wording in too many clauses makes a release overbearing, overly broad, and makes it very difficult for someone to really understand and hone in on when it is that the defendant's liability is released. And I think that's what happened in this case. I think the Hussein case, for example, is a very good example, where it just simply says, any and all, it lists equipment, it lists any and all use of the gym, any and all equipment, and it's short, sweet, and to the point. It doesn't talk about the ability of one's participation. It doesn't say inherent risks that the person has the subjective knowledge. I mean, this release is very clear in saying, I have knowledge of the inherent risks. It doesn't say anything above and beyond that. And I think that's what makes this release so different. More importantly, the various cases that your Honor mentioned, as well as the Hussein case, we're talking about activities that are to the general public. When you walk into a health club, you know there's going to be lots of different machines. Are you going to know how to use every single machine? No, you're not. But in front of that machine and attached to every single machine are instructions on how to use it, are instructions on when it's dangerous to use it. All this foam pit had to do, it's like a simple. . . There is a big sign. Huh? There is a big sign. And according to my client, he didn't do anything outside of what that sign said. He jumped. It did not say how deep it is. Let's make sure the record's clear. Your understanding of the record is he jumped off the vault? No. The platform. My client's testimony is that he jumped off of the springboard that was in front of the foam pit. And he was never on the platform? That he was never on the vault table, no. And I have a hard time understanding how a 300-pound young man is going to get from on top of a vault table. I'm a trained gymnast, so I can tell you it's not the easiest thing to do to climb up on that thing because there's no stairs there or anything. And with all due respect, the testimony of the one witness who stated that she saw him, it's not very credible because if she claims that she saw him. . . Well, that's a question of fact. Well, correct. But again, these are things that bolster plaintiff's original response to the 2619 motion to dismiss in which Judge Hollis Webster relied on his affidavit. And all of the testimony that came out during deposition did nothing more than bolster plaintiff's affidavit and response to that original motion to dismiss. There were no additional facts brought out. And I think that's really the key thing here. And again, I understand that this release is two pages long. I understand that it is longer than a lot of the other releases, and counsel calls it a fastidious release. But again, we're comparing it to other releases that did not have numerous clauses. This one did. So you're saying the detriment of this release is it was too in-depth versus some of the other releases? I don't think it's too in-depth. I think that the fault of this release is twofold. The first is that it has too many clauses. It talks about a physical ability to participate. It talks about one's own knowledge of the inherent risks. But then when it does deal with the specificity and things like landing surfaces and equipment, we once again, the whole entire point of the foreseeability is that it must be such an activity that ordinarily accompanies and that the risk must be such that the plaintiff knew or should have known of the risk, and more importantly, the extent of the injury. Well, how about the clause that says, the very last clause before he signs, recognize the dangers inherent with climbing and jumping activities. I am assuming the hazard of this risk upon myself because I wish to participate. I realize that I am subject to injury from this activity and that no form of pre-planning can remove all of the danger to which I am exposing myself. And how much more explicit, in addition to the two pages previous to that, how much more explicit can you get? And again, it becomes an issue of foreseeability. And the foreseeability is what did he know at the time that he signed the release. And for example, if we go to the various cases that talk about foreseeability, whether it be Faulkner or Harris or Garrison. How about Schlesman v. Henson? That's the track collapse. Yeah, the wall, the embankment collapse that was totally outside of the scope of the expectations of the individuals who were privy to the exclusionary clause. And with all due respect to that decision, the only way that I can distinguish it from this case is the fact that at least the person who got on that track had been driving cars, had raced cars before, was aware of what a track looks like, was aware that there are walls that one drives through that one can crash into and that walls can crumble. And in this case, we have a plaintiff who very clearly states he had no idea what a foam pit was. He had never seen a foam pit before. You keep harping back to what did he know when he signed the release. But isn't the real issue what did he know when he jumped off the springboard into the foam pit? Because when he signed the release, let's assume he knows nothing about gymnastics or foam pits or anything like that. But he testified pretty unequivocally that on January 15th, had he read that release, he would have known the foam pit was a landing surface and he would have known that he was holding them harmless from anything that happened on a landing surface, including broken bones, up to death. I mean, that's what the release says. So if he read that and he would have realized that at the time when he walked into the gym and saw the foam pit, then maybe he would have had a little bit of a different understanding as to what the inherent risks were, as to what the risks ordinarily accompanying something were. So, I mean, are you not taking your focus off what we really should be looking at? You're focusing on what he knew when he signed the release as opposed to what he knew before he jumped into the pit? And I think that with that argument, again, my reading of the case law is what is your understanding of the inherent risks the time that you sign it and what's your understanding of the inherent risks at the time right before you take on the activity that causes your injury? And even when he was standing on that springboard jumping off, he had no idea of what the inherent risks. All they had to do maybe simply was put in, you know, how deep it is. It's less deep than how tall he is. Or they could have said, hey, here's a weight restriction on this, something so simple as that, something that's on all equipment in every standard gym across the United States. That's why they have this is how you use it. This is, you know, if you're above this weight, this is what the weight restrictions are. And they didn't have that in this case. And again, gymnasts are usually little tiny people. They're not 6'2 1⁄2", over 320 pounds like this person was. And when they saw him walk into the gym, there should have been some extra care there, possibly. And that's not the argument, and that's a question, again, you know, if this case gets remanded back to make to the jury with regards to the supervision. But the question becomes did he know what he was getting himself into? Did he know of the risk? And did he appreciate the type of injury? And that's what's clear from his deposition testimony, that he didn't. And it's exactly what was in his affidavit that was the basis of Judge Hollis Webster's ruling. Anything further? That's all I have. Thank you very much. Thank you so much for your arguments, counsel. We appreciate your time, and thanks for trekking out to Elgin in the snow. Have a great day, and a decision will be rendered in due course. Court is adjourned.